AO 106 (Rev. 04/10) Application for a Search Warrant                    AUSA

**FILED**
5/6/2022
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT

for the

_____ District of _____

Division

| | |
|---|---|
| In the Matter of the<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)* | )<br>)<br>)<br>)<br>)<br>) |

Case No.

**UNDER SEAL**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*


located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:


The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

❏ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

❏ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| | |

The application is based on these facts:


❏ Continued on the attached sheet.

❏ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Pursuant to Fed. R. Crim. P. 4.1, this Application is presented by reliable electronic means. The Applicant and/or Affiant provided a sworn statement attesting to the truth of the statements in the Application and Affidavit by telephone, as applicable.

_____
*Applicant's signature*

_____
*Printed name and title*

Sworn to and affirmed by telephone.

Sworn to before me and signed in my presence.

Date: _____          2:20pm

_____
*Judge's signature*

City and state: _____

_____
*Printed name and title*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| INFORMATION ASSOCIATED WITH THE CELLULAR DEVICE ASSIGNED WITH (312) 483-9994 ("**SUBJECT PHONE 2**") AND (773) 574-9769 ("**SUBJECT PHONE 3**") IN THE CUSTODY OF T-MOBILE | Case Number: 22M375 Hon. Jeffrey Cole Magistrate Judge **UNDER SEAL** |

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Task Force Officer Mohammad Yusuf, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A) for prospective location and other information associated with: (1) the cellular telephone assigned call number (773) 574-9769 ("**Subject Phone 3**") and currently using IMEI 351224675406550, subscribed to Jose DEL TORO, at 8730 N. Springfield Avenue, Skokie, Illinois, and used by Freddy DEL TORO, whose service provider is T-MOBILE ("Provider"), a wireless telephone service provider that is headquartered at 4 Sylvan Way, Parsippany, New Jersey, 07054; and (2) the cellular telephone assigned call number (312) 483-9994 ("**Subject Phone 2**") and currently using IMEI 355070814282730, subscribed to "Prepaid Customer," at 4001 W Armitage Ave Chicago, Illinois, and used by members of the DEL TORO DTO including Freddy DEL TORO, whose service provider is T-MOBILE ("Provider"), as further described below

1

and in Attachment B. **Subject Phone 2** and **Subject Phone 3** are further described below and in Attachment A.[1]

2.      Upon receipt of the information described in Sections I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

3.      As a provider of wireless communications service, Provider is a provider of an electronic communication service, as defined in 18 U.S.C. § 2510(15).

4.      Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), and because this warrant seeks the installation and use of a pen register and a trap and trace device, the requested warrant is designed to also comply with the Pen Register Act. *See* 18 U.S.C. §§ 3121-3127. The requested warrant therefore includes all the information required to be included in an order pursuant to that statute. *See* 18 U.S.C. § 3123(b)(1).

5.      I am a Task Force Officer with the Drug Enforcement Administration ("DEA") and have been since approximately July 2021. I am currently assigned to the High Intensity Drug Trafficking, Violent Gangs Conspiracy Group (VGCG) program.

---

[1] On May 4, 2022, the government sought and obtained a search warrant for prospective location and other information associated with **Subject Phone 2** and **Subject Phone 3** in Case No. 22 M 364 before the Honorable Magistrate Judge Jeffrey Cole. After obtaining the warrant but before executing it, law enforcement observed that the search warrant, affidavit, and application misidentified the IMEI numbers for **Subject Phone 2** and **Subject Phone 3**. Specifically, the IMEI number for **Subject Phone 3** was incorrectly listed as an "IMSI" number, and the IMEI number for **Subject Phone 2** was incorrect. This warrant for **Subject Phone 2** and **Subject Phone 3** corrects both mistakes.

I have been employed with the Chicago Police Department since November 2004. My official duties include the investigation of drug trafficking organizations and violations of federal narcotics laws. I have received training in and have experience investigating violations of both federal and state narcotics laws including, but not limited to, Title 21, United States Code, Sections 841 and 843. I have participated in numerous investigations involving a variety of investigative techniques, including physical and electronic surveillance methods; controlled purchases and deliveries of narcotics; the analysis of a wide variety of records and data, including pen register and trap and trace data as well as cell phone location data; and the debriefing of defendants, confidential sources, and witnesses, as well as others who have knowledge of the distribution, transportation, storage, and importation of controlled substances. In addition, I have received specialized training in both State and Federal Title III investigations and have participated in several Title III investigations as a monitor, and surveillance agent.

6.     Through investigations, my training and experience, and conversations with other law enforcement officers, I have become familiar with the methods used by narcotics traffickers to distribute, transport, store, import, and safeguard controlled substances. I know that narcotics trafficking organizations have developed a number of methods to insulate their illegal activities from law enforcement detection. For instance, I know that members of narcotics trafficking organizations routinely utilize electronic communications facilities, including cellular telephones, to communicate operational directives and information concerning the conduct of the

organization's illegal activities to other organization members; that organization members routinely use coded references in an effort to avoid law enforcement detection; and that the communication of time-sensitive information is critical to the successful conduct of these organizations' illegal activities. I am also familiar with narcotics traffickers' use of prepaid cellular and cellular phones, normal land line phones, public phones, debit calling cards, counter-surveillance, and the use of false and/or fictitious identities. Finally, I am familiar with the coded language used by narcotics traffickers during conversations in an attempt to disguise the true meaning of their conversations.

7.    The facts in this affidavit come from, among other things, my personal observations, my training and experience, information obtained from other law enforcement and witnesses, and the training and experience of other law enforcement with whom I have spoken. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

8.    Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 841(a)(1) and 843 has been and will be committed by Alexis DEL TORO and other co-conspirators. There is also probable cause to search the information Provider is to produce pursuant to Attachment B for evidence of these criminal violations.

9.    The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court

is a district court of the United States that has jurisdiction over the offense being investigated; *see* 18 U.S.C. § 2711(3)(A)(i); and is in a district in which T-Mobile is located or in which the items described Attachment A are stored, *see* 18 U.S.C. § 2711(3)(A)(ii).

## PROBABLE CAUSE

10.     The United States, including the DEA, is conducting a criminal investigation of Alexis DEL TORO, Freddy DEL TORO, and other co-conspirators regarding possible violations of Title 21, United States Code, Sections 841(a)(1) and 843. As summarized below, since approximately December 2021, the Chicago Police Department (CPD) has been investigating the drug trafficking activities of the DEL TORO Drug Trafficking Organization (DTO). In February 2022, CPD requested assistance from DEA with the investigation into the DEL TORO DTO.

11.     During the course of the investigation, law enforcement has learned that Alexis DEL TORO, a member of the DEL TORO DTO, has been working with other associates of the DTO to distribute narcotics including heroin, cocaine, crack cocaine, and other illegal pharmaceuticals in and around Chicago, Illinois.[2]

12.     During the course of the investigation, on several occasions, law enforcement officials acting in an undercover capacity have been able to purchase

---

[2] Law enforcement has also learned that members of the DTO are active members of the La Familia Stones street gang, who are known to commit acts of violence in order to maintain their criminal enterprise. Specifically, members of the DTO are known to brandish and discharge firearms, commit robberies and batteries, and operate in stolen vehicles to commit their crimes. For example, on or about April 5, 2022, Alexis DEL TORO was arrested by the Chicago Police Department and charged with murder. He currently is in State custody.

narcotics from members of the DEL TORO DTO. During these undercover purchases of narcotics, the DTO has used **Subject Phone 2** to coordinate the distribution of narcotics to customers throughout Chicago and surrounding areas. Specifically, the undercover officers posing as narcotics customers are directed to contact **Subject Phone 2** to arrange their order and a time and place for the narcotics transaction to occur. The undercover officers are directed to drive to a public location, such as a fast-food restaurant, where they are then met by members of the DTO—who arrive in various vehicles—to conduct the narcotics transaction.

A. **The March 2, 2022, Purchase of Narcotics from Freddy DEL TORO who was using Subject Phone 3.**

13. On or about March 2, 2022, at approximately 4:00 p.m., law enforcement met with a CPD officer acting in an undercover capacity ("UC6"), who was equipped with an audio and video recording device. UC6 was also provided with $200 in government funds to purchase narcotics from the DEL TORO DTO. At approximately 3:38 p.m., UC6 placed a recorded telephone call to **Subject Phone 3**. During the recorded phone call, a male voice answered at which time UC6 recognized the voice as Freddy DEL TORO.[3] UC6 stated, "Yo yo what's up brother man you a hard man to get a hold of." Freddy DEL TORO responded, "Yeah my bad bro," to which UC6 replied, "It's all good brother man, hey man I had a lame last weekend bro I needed you but I'm wondering if um, if you free today man, if we could, we could link up

---

[3] UC6 identified Freddy DEL TORO based on previous interactions with him during the narcotics investigation into the DEL TORO DTO. Specifically, UC6 previously spoke to and met with Freddy DEL TORO on February 16, 2021, to conduct a narcotics transaction.

maybe in about an hour or so?" [4] Freddy DEL TORO responded, "Perfect cuz um, should we meet over by Rosemont?" to which UC6 replied, "Yeah I can be. I'm right off the highway, I gotta, I'm at work right now, so if you wanna meet up there somewhere we can do that whatever is easiest." Freddy DEL TORO stated, "Yeah cuz Imma go to the outlets over there like in an hour I'll be over there." Freddy DEL TORO and UC6 agreed to meet up in approximately one hour.

14.    At approximately 5:18 p.m., UC6 received a text message from Freddy DEL TORO, who was using **Subject Phone 3**, directing UC6 to meet in the area of west Devon Avenue and North Harlem Avenue, to which the UC6 agreed. At approximately 5:34 p.m., UC6 received a text message from Freddy DEL TORO, who was using **Subject Phone 3**, redirecting UC6 to the Taco Burrito King (TBK) located at 5509 N Harlem Ave., to which UC6 agreed.

15.    At approximately 5:38 p.m., UC6 contacted Freddy DEL TORO, who was using **Subject Phone 3,** via text message to let him know that UC6 was almost to the meeting location. Freddy DEL TORO directed UC6 to meet in the back-parking lot of TBK. Law enforcement surveillance units relocated to the area to establish surveillance prior to the narcotics transaction.

16.    At approximately 5:43 p.m., CPD surveillance units observed a dark brown/black Honda CR-V bearing Illinois registration CH22040, enter the rear lot of

---

[4] All recorded calls referenced in this Affidavit took place in the English language and have been summarized. I based the language quoted from the recorded conversations throughout this Affidavit on a preliminary review of the recorded conversations—and not on final transcripts of the recorded conversations. The times listed for the recorded conversations are approximate. The summaries of the recorded conversations do not include all statements made or topics covered during the course of the recorded conversations.

the TBK and park next to the undercover law enforcement vehicle occupied by UC6. Surveillance units observed Freddy DEL TORO exit the driver's side of dark brown/black Honda CR-V and enter the front passenger side of the undercover law enforcement vehicle occupied by UC6.

17. According to UC6, at approximately 5:43 p.m., Freddy DEL TORO entered the front passenger side of UC6's vehicle and handed UC6 three clear knotted plastic bags, each containing a white powdery substance, containing suspect cocaine, in-exchange for $200 dollars of government funds that UC6 handed to Freddy DEL TORO. As captured on the audio recording device, Freddy DEL TORO stated, "This is a this is a hundro [$100 bag of cocaine] right there and two 50's [2 $50-dollar bags of cocaine] there, cool?" UC6 responded, "Perfect, that will work brother." Freddy DEL TORO replied, "Alright man take it easy alright, hit me up." Freddy DEL TORO then exited the undercover vehicle, entered the dark brown/black Honda CR-V, and left the area. Surveillance units observed UC6 leave the area and relocate to a pre-determined meet location.

18. Law enforcement subsequently field tested the substances located in the small clear plastic bags provided to UC6 by Freddy DEL TORO. Approximately 3.5 grams of the substance field tested positive for the presumptive presence of cocaine.

**B.    The March 11, 2022 Purchase of Narcotics from Freddy DEL TORO who was using Subject Phone 3.**

19. On or about March 10, 2022, between approximately 3:30 p.m. and 6:05 p.m., UC6 engaged in a series of recorded text messages with **Subject Phone 3**, utilized by Freddy DEL TORO. During the text conversation, UC6 and Freddy DEL

TORO discussed a future narcotics transaction. Specifically, at 3:30 p.m., UC6 texted **Subject Phone 3**, "Sup bro...last weekend was (fire emoji) Imma hit u up tomorrow to link up." At approximately 3:31 p.m., **Subject Phone 3** replied, "Ight coo bro." At approximately 6:03 p.m., UC6 stated, "You good around 1 or usual time?" **Subject Phone 3** replied, "Yeah whenever you ready." At approximately 6:05 p.m., UC6 stated, "Iight cool i just gotta sneak outta work for lunch. Thanks bro."

20.     The next day on or about March 11, 2022, at approximately 12:00 p.m., law enforcement met with UC6. UC6 was equipped with an audio and video recording and was provided with $300 of pre-recorded government funds to purchase cocaine from Freddy DEL TORO, utilizing **Subject Phone 3** to coordinate narcotics deliveries.

21.     At approximately 12:23 p.m., UC6 placed a recorded telephone call to **Subject Phone 3**, which went unanswered.

22.     At approximately 12:25 p.m., UC6 received an incoming call from **Subject Phone 3**. During the recorded phone call, a male voice spoke to UC6, which UC6 immediately recognized to be the voice of Freddy DEL TORO's.[5] During the conversation, UC6 and Freddy DEL TORO discussed where to meet to conduct a narcotics transaction. Freddy DEL TORO asked UC6, "Ah Can you come right here on Dempster and Crawford at the Walgreens?" UC6 agreed. Freddy DEL TORO then asked, "Yeah that's cool, what you need though?" UC6 responded, "Um Lemme get

---

[5] UC6 identified Freddy DEL TORO's voice based on previous phone interactions and meetings with him during the narcotics investigation into the DEL TORO DTO, including the in person and phone interactions from March 2, 2022, described above.

um 4 50s [4 $50 individually packaged bags of cocaine]." Freddy DEL TORO replied, "Ah I got you bro," to which UC6 stated, "Sweet, thanks brother I see you in a bit."

23.     At approximately 12:48 p.m., UC6 arrived in an undercover vehicle to the Walgreens parking lot located at 3945 W. Dempster Street.

24.     At approximately 1:00 p.m., surveillance units observed a 2016 black Lexus bearing Illinois registration BX69659[6] enter the Walgreens parking lot where UC6 was parked. Based on previous narcotics deliveries to UC6, surveillance units positively identified the driver of the black Lexus as Freddy DEL TORO. Surveillance units observed Freddy DEL TORO park next to UC6, exit the black colored Lexis, and enter the front passenger's side of the undercover law enforcement vehicle occupied by UC6.

25.     According to UC6, Freddy DEL TORO entered the front passenger side of UC6's vehicle and provided UC6 with one clear knotted bag containing a white powdery substance, which was suspect cocaine, in exchange for the $200 in government funds provided by UC6. As captured on the audio recording device, during this exchange, Freddy DEL TORO stated to UC6, "What's up my dude. Hey um, this $200 [$200 worth of cocaine] right here brother I just had no baggies extra to bag it up you know." UC6 responded, "Okay, hey real quick man. I know this is last minute, my boy liked your shit and he gave me $100.  Can I get 2 50's [2 $50 bags of cocaine] for him? Freddy DEL TORO responded, "Yeah, yeah alright let me

_____

[6] According to law enforcement databases, the black Lexus bearing Illinois registration BX69659 is registered to Leticia Soto, the mother of Alexis and Freddy DEL TORO, at 8730 Springfield, Skokie, Illinois.

go get them though, real quick, that's cool?" UC6 stated, "Yeah, how long you think?" Freddy DEL TORO responded, "Like 5-6 minutes. Alright."

26.     Surveillance units observed Freddy DEL TORO depart UC6's undercover vehicle and arrive again at approximately 1:08 p.m.  Freddy DEL TORO approached the passenger's side of the vehicle and partially entered. According to UC6, during the second meeting, Freddy DEL TORO handed UC6 $100 worth of suspect narcotics, and in return UC6 gave Freddy DEL TORO $100 in pre-recorded funds. As captured on the audio recording device, Freddy DEL TORO stated, "One hundred right?" UC6 responded, "Yeah." Freddy DEL TORO stated, "Alright my dude." UC6 responded, "Thanks brother, I'll see you."

27.     Shortly afterwards, surveillance units observed Freddy DEL TORO exit the undercover law enforcement vehicle occupied by UC6, enter the front driver's side of the black colored Lexis, and depart the area. UC6 then met law enforcement at a pre-determined meeting location to provide the narcotics that were purchased from Freddy DEL TORO.

28.     Law enforcement subsequently field tested the substance Freddy DEL TORO provided to UC6. Approximately 7.0 grams of a white powdery substance field tested positive for the presumptive presence of cocaine.

**C.      The March 17, 2022 Purchase of Narcotics from Freddy DEL TORO Who Was Using Subject Phone 2.**

29.     On or about the morning of March 17, 2022, law enforcement met with a Chicago Police Department Officer acting in an undercover capacity ("UC2"). UC2

was equipped with an audio and video recording device and was provided with $160 in government funds to purchase crack cocaine from the DEL TORO DTO.

30.     At approximately 2:10 p.m., UC2 placed a call to **Subject Phone 2** to coordinate a narcotics transaction.[7] According to UC2, during the telephone conversation, UC2 and an unknown male subject discussed a future narcotics transaction. UC2 and the male subject agreed to meet at the Golden Nugget restaurant located at 4229 W Irving Park approximately five to ten minutes after the call. UC2 related the information to law enforcement surveillance units who relocated to the area.

31.     At approximately 2:26 p.m., UC2 received an incoming call from **Subject Phone 2**. During the recorded conversation, the unknown male subject stated, "What you need?" UC2 replied, "C, you got C?"[8] The unknown male subject stated, "How much?" UC2 responded, "I got like 150 on me is that cool?" The unknown male subject stated, "150?" and UC2 replied, "Yeah." The unknown male subject responded, "Yeah that's cool," and the conversation ended.

32.     Several minutes later at approximately 2:30 p.m., UC2 placed an outgoing call to **Subject Phone 2**, but law enforcement was unable to hear the recorded telephone call due to technical difficulties. At approximately the same time, law enforcement observed UC2 arrive in the vicinity of 4229 W Irving Park in an

---

[7] Due to technical equipment malfunction, UC2's initial call to **Subject Phone 2** was not recorded.

[8] Based on my training and experience, "C" is a common term to reference cocaine or crack cocaine.

undercover vehicle. Law enforcement observed UC2 relocate the undercover vehicle and park next to a gold-colored Toyota 4Runner bearing Illinois license plate DF81238[9], exit the undercover vehicle, and approach the front passenger side open window of the 4Runner. According to UC2, once at the window, Freddy DEL TORO handed UC2 one clear plastic bag containing six smaller plastic bags with a white, rock-like substance, and UC2 tendered $160 to Freddy DEL TORO.[10] As captured on the audio recording device, while meeting with UC2, Freddy DEL TORO stated, "I only have $100 worth." Freddy DEL TORO then returned $60 of the pre-recorded government funds back to UC2.

33.    At approximately 2:31 pm, law enforcement observed UC2 walk away from the 4Runner, return to the undercover vehicle, and leave the area. Law enforcement observed the 4Runner depart the area at a high rate of speed and park on Byron Street approximately one block away from where the narcotics transaction took place. After the 4Runner parked, law enforcement observed the driver, Freddy DEL TORO, the lone occupant of the vehicle, park the vehicle.

34.    Law enforcement subsequently field tested the suspect narcotics that Freddy DEL TORO provided to UC2. The substance, approximately 2.9 grams, field tested positive for the presumptive presence of cocaine.

---

[9] According to Illinois Secretary of State records, Illinois license plate number DF81238 returns to a gold Toyota Carryall with VIN# JTEBT14R040044869, and is registered to Alexis DEL TORO at 8730 Springfield Avenue, Skokie, Illinois 60076.

[10] UC2 stated that he/she recognized Freddy DEL TORO based on his/her knowledge of the investigation and photographs he/she has reviewed of members of the DEL TORO DTO. Also, after the undercover operation, UC2 identified Freddy DEL TORO as the one that delivered the narcotics in a photo array conducted at the Chicago Police Department.

**D.      The April 7, 2022 Purchase of Narcotics from Freddy DEL TORO who was using Subject Phone 3.**

35.      On or about April 6, 2022, between approximately 9:08 p.m. and 10:10 p.m., UC6 engaged in a series of recorded text messages with **Subject Phone 3**, used by Freddy DEL TORO. At approximately 9:08 p.m., UC6 arranged to purchase "6 50s" (6 individually packaged bags of cocaine, each worth $50), and UC6 and Freddy DEL TORO agreed to meet on April 7, 2022.

36.      On or about April 7, 2022, at approximately 2:00 p.m., law enforcement met with a with UC6. UC6 was equipped with an audio and video recording device and was provided with $300 of pre-recorded government funds to purchase cocaine from Freddy DEL TORO, who was utilizing **Subject Phone 3** to coordinate narcotics deliveries.

37.      At approximately 2:17 p.m., UC6 placed a recorded telephone call to **Subject Phone 3**. A male voice answered at which time UC6 immediately recognized the voice as Freddy DEL TORO**.** During the recorded telephone conversation UC6 and Freddy DEL TORO agreed to meet in approximately 30 minutes near the intersection of Broadway Street and Barry Avenue.

38.      At approximately 2:42 p.m., law enforcement surveillance agents observed an undercover vehicle driven by UC6 arrive and park at 553 W Barry Avenue, across from a CVS Pharmacy. At approximately 2:43 p.m., UC6 placed a recorded telephone call to **Subject Phone 3** advising Freddy DEL TORO of UC6's location. Freddy DEL TORO responded, "Aight cool, coming out right now."

14

39.    At approximately 2:44 p.m., UC6 received an incoming call from **Subject Phone 3** which went unanswered. UC6 immediately return the missed call. During the recorded telephone conversation, Freddy DEL TORO informed UC6 that his brother was outside looking for UC6. UC6 informed Freddy DEL TORO that UC6 would exit UC6's vehicle.

40.    At approximately 2:47 p.m., surveillance units observed Freddy DEL TORO and an unidentified Hispanic male exit 3021 N. Broadway and walk northbound towards where UC6 was located. Several minutes later, Freddy DEL TORO met UC6 and both continued to walk northbound towards the undercover vehicle. The unidentified Hispanic male walked back towards 3021 N. Broadway and re-entered the residence. UC6 then entered the driver's side of the undercover vehicle and Freddy DEL TORO entered the passenger's side.

41.    According to UC6, Freddy DEL TORO provided UC6 with one clear knotted plastic bag, containing six smaller clear knotted plastic baggies, each containing suspect cocaine. In exchange, UC6 provided Freddy DEL TORO with $300 of pre-recorded government funds. As captured on the audio recording device, at approximately 2:51 p.m., Freddy DEL TORO stated "Count it," to which UC6 replied "You good bro."

42.    At approximately 2:51 p.m., surveillance units observed Freddy DEL TORO exit the undercover vehicle, walk southbound on Broadway Street, and enter the front door of 3021 N Broadway Street.

15

43.     Law enforcement subsequently field tested the substances located in the small clear plastic bags that Freddy DEL TORO provided to UC6. Approximately 5.0 grams of the substance field tested positive for the presumptive presence of cocaine.

### E.     The April 7, 2022, Purchase of Narcotics from Freddy DEL TORO and Ruben VALENCIA Who Was Using Target Phone 2.

44.     On or about April 7, 2022, at approximately 3:15 p.m., law enforcement met with a Chicago Police Department Officer acting in an undercover capacity ("UC1"). UC1 was equipped with an audio and video recording device and was provided with $250 in government funds to purchase crack cocaine from the DEL TORO DTO.

45.     At approximately 3:25 p.m., UC1 placed a recorded telephone call to **Subject Phone 2**. During the recorded phone conversation, a male voice answered at which time UC1 immediately recognized the voice as Freddy DEL TORO.[11] During the recorded telephone conversation UC1 stated, "Bro I need that butter man. Can we get it . . . (unintelligible partial conversation) get some goin on what up?" And then, "I need 3 of them things [three individually packaged bags of crack cocaine] bro." Freddy DEL TORO responded, "Yeah, where you at bro?" UC1 replied, "Wilson and Kedzie at that McDonalds where I'm always at." Freddy DEL TORO then asked UC1, "You need that hard [crack cocaine], right?" UC1 replied, "Hard baby, hard," to which Freddy DEL TORO stated, "Got you man."

---

[11] UC1 recognized the voice to be Freddy DEL TORO based on a previous narcotics controlled buy between UC1 and Freddy DEL TORO on December 22, 2021. UC1 also recognized the voice of Freddy DEL TORO from being present on several controlled narcotics purchases between UC6 and Freddy DEL TORO.

46.    At approximately 3:28 p.m., UC1 received an incoming call from **Subject Phone 2**.  During the recorded telephone conversation, UC1 recognized the male voice as Freddy DEL TORO's. UC1 stated, "Hey baby, hey baby, yes 3 50s baby". (meaning 3 individually packaged bags of crack cocaine, each worth $50.00 USC). During the conversation, UC1 and Freddy DEL TORO agreed to meet in approximately thirty minutes.

47.    At approximately 4:14 p.m., law enforcement surveillance agents observed an undercover vehicle driven by UC1 arrive and park at the McDonald's located at 4552 N. Kedzie.

48.    At approximately 4:12 p.m., UC1 received an incoming recorded call from **Subject Phone 2**, at which time Freddy DEL TORO instructed UC1 to meet him in the alley behind the McDonald's.  Law enforcement surveillance units observed UC1 exit the undercover vehicle, and then return briefly to retrieve UC1's phone. At approximately 4:16 p.m., UC1 placed a recorded call to **Subject Phone 2**, informing Freddy DEL TORO that UC1 was in the alley.  Freddy DEL TORO told UC1 to look for an individual on a bicycle. UC1 continued walking southbound in the alley before approaching an unknown male Hispanic wearing a light blue puffy jacket, dark blue hooded sweatshirt and blue jogging pants, holding a bicycle and walking northbound in the alleyway. Law enforcement surveillance units also observed this individual, who was later identified as Ruben VALENCIA.[12]

---

[12] Following the transaction, a photo-array was conducted at which time UC1 positively identified Ruben VALENCIA as the subject who sold UC1 crack cocaine in-exchange for pre-recorded government funds. Law enforcement also compared still images from UC1's video

49.    At approximately 4:18 p.m., surveillance units observed VALENCIA approach UC1, engage in a brief conversation, and then conduct a hand-to-hand transaction. According to UC1, and as captured on the audio and video recording, VALENCIA gave UC1 three clear knotted plastic bags, each containing a white rock like substance in exchange for $200 in pre-recorded government funds. According to UC1, and as captured on the audio and video recording, UC1 then asked VALENCIA for more narcotics, and the two exchanged cell phone numbers. VALENCIA provided UC1 with cell phone number (312) 383-3880 and relayed that he would be back.

50.    According to law enforcement surveillance units, UC1 and VALENCIA then departed the location. At approximately 4:22 p.m., agents observed VALENCIA walk southbound toward 4457 N Kedzie and enter the front door.[13]

51.    At approximately 4:37 p.m., UC1 placed a recorded call to VALENCIA at (312) 383-3880. During the recorded phone conversation, UC1 informed VALENCIA that UC1 was headed back to the alleyway behind the McDonald's. At approximately 4:38 p.m., surveillance units observed VALENCIA walk from the location of 4459 N. Kedzie Avenue to the alleyway where UC1 was located. VALENCIA then engaged in a brief conversation and hand-to-hand exchange with UC1, before UC1 returned to the undercover vehicle.

---

recording with known images of VALENCIA and was also able to positively identify Ruben VALENCIA as the subject who delivered crack cocaine to UC1.

[13] According to law enforcement databases, on or about Aug 6, 2021, VALENCIA was reported as a victim in a CPD police report in which he provided (312) 383-3880 as his phone number and 4457 N. Kedzie as his home address.

52.     According to UC1, during the second exchange, VALENCIA gave UC1 one clear knotted plastic baggie in exchange for $50 in pre-recorded government funds. As captured on the audio recording device, UC1 then stated to VALENCIA, "That's some big bag man, I love it."

53.     Law enforcement subsequently field tested the substances located in the small clear plastic bags provided to UC1 by Freddy DEL TORO and Ruben VALENCIA. Approximately 4.0 grams of the substance field tested positive for the presumptive presence of cocaine.

**F.     The April 12, 2022 Purchase of Narcotics from Freddy DEL TORO Who Was Using Target Phone 2.**

54.     On or about the morning of April 12, 2022, law enforcement met with UC2, who was equipped with an audio and video recording device and provided with $160 in government funds to purchase crack cocaine from the DEL TORO DTO.

55.     At approximately 12:47 p.m., UC2 placed a recorded call to **Subject Phone 2**, at which time a male voice answered who UC2 immediately recognized as Freddy DEL TORO. During the recorded telephone conversation, UC2 requested to purchase $300 worth of "C" [crack cocaine] and arranged to meet Freddy DEL TORO near the location of Irving Park and Tripp Avenue. Freddy DEL TORO stated, "I said lemme c if this guy has enough and I'll call you right back."

56.     At approximately 12:49 p.m., UC2 received an incoming call from **Subject Phone 2**. During the recorded conversation, Freddy DEL TORO told UC2, "Yes this guy only has 3 50s [three individually packaged bags of crack cocaine, each worth $50], um but I got it but I'm like, I mean I'm at home right now, unless you

19

wanna come this way." Freddy DEL TORO informed UC2 that he was near Broadway and Barry.[14] UC2 agreed to meet Freddy DEL TORO in the area of Broadway and Barry in approximately 20 minutes.

57.     At approximately 1:19 p.m., UC2 received an incoming call from **Subject Phone 2**, in which Freddy DEL TORO inquired about UC2's location. UC2 confirmed that UC2 was on the way to the meeting location. During the recorded phone conversation, Freddy DEL TORO also confirmed the dollar amount that UC2 was going to purchase, and UC2 replied, "Yeah 300."

58.     At approximately 1:21 p.m., law enforcement surveillance agents observed an undercover vehicle driven by UC2 arrive and park at 554 W. Barry Avenue.

59.     At approximately 1:22 p.m., UC2 placed a recorded telephone call to **Subject Phone 2**, informing Freddy DEL TORO that UC2 had arrived and was parked at 554 W. Barry Avenue. At approximately the same time, law enforcement surveillance units observed Freddy DEL TORO exit the front door of 3021 N Broadway and walk northbound toward the CVS Pharmacy where UC2 was parked. Freddy DEL TORO was talking on a cellphone as he exited the residence. Surveillance units then observed UC2 exit the undercover vehicle while still on the phone, walk to the front of the CVS Pharmacy, engage in a brief conversation with

---

[14] During previous undercover narcotics transactions, including April 7, 2022, Freddy DEL TORO has been observed entering and exiting the residence located at 3021 N Broadway, which is one block away from the intersection at N. Broadway and W. Barry Avenue.

Freddy DEL TORO, and then walk back to the undercover vehicle. UC2 entered the driver's side and Freddy DEL TORO entered the front passenger side.

60.    According to UC2, once inside the car, Freddy DEL TORO gave UC2 one clear knotted plastic bag, containing eight clear knotted plastic baggies, each containing a white rock like substance in exchange for $300 in pre-recorded government funds. As captured on the audio recording, Freddy DEL TORO stated to UC2, "I gave you seven 50s [$50 bags] and a dub [$20 bag]." UC2 replied, "thanks."

61.    At approximately 1:23 p.m., surveillance units observed Freddy DEL TORO exit the undercover vehicle, walk to 3021 N Broadway, and re-enter the front door.

62.    Law enforcement subsequently field tested the substances located in the small clear plastic bags provided to UC2 by F. DEL TORO. Approximately 5.0 grams of the substance field tested positive for the presumptive presence of cocaine.

## BACKGROUND ON LOCATION AND OTHER INFORMATION

63.    Based on my training and experience, as well as the training and experience of other law enforcement officers with whom I have spoken, I know that drug traffickers often use multiple telephones to conduct their illegal activities in an attempt to make it more difficult for law enforcement to detect illegal activity. For example, a drug trafficker may use one telephone number to communicate with customers and a second telephone number to communicate with suppliers or co-conspirators. This practice allows drug traffickers to isolate different aspects of their

illegal activities, which makes it more difficult to identify the extent of the illegal activities.

64.     Based on my training and experience, the training and experience of other law enforcement officers with whom I have spoken, and my involvement in this investigation, I believe that Freddy DEL TORO and other members of the DEL TORO DTO utilize **Subject Phone 2** to communicate with customers. I also believe that Freddy DEL TORO utilizes **Subject Phone 3** to communicate with suppliers and other co-conspirators.

65.     Based on my training and experience, I have learned that Provider is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data, also known as GPS data or latitude-longitude data and cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal form the cellular telephone and, in some case, the "sector" (i.e., faces of the towers) to which the telephone is connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas.

22

Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise than E-911 Phase II data.

65.     Based on my training and experience, I know that Provider can collect E-911 Phase II data about the location of **Subject Phone 2** and **Subject Phone 3**, including by initiating a signal to determine the location of **Subject Phone 2** and **Subject Phone 3** on Provider's network or with such other reference points as may be reasonably available.

66.     Based on my training and experience, I know Provider can collect cell-site data about **Subject Phone 2** and **Subject Phone 3**. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as Provider typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes. Based on my training and experience, location information provides evidence regarding the whereabouts of subjects of investigation at time when criminal conduct may be occurring and identifies locations where criminal activity may be occurring, thereby assisting law enforcement agents in

23

establishing surveillance, identifying participants in the criminal activity, and identifying locations and vehicles to be searched for physical evidence. Such information also can assist law enforcement in identifying patterns of activity and movement, as well as relationships among individuals involved in the criminal activity. For example, location information for **Subject Phone 2** and **Subject Phone 3** may provide information concerning Freddy DEL TORO and other associates of the DEL TORO DTO location prior to, during, and following any narcotics transactions and/or other criminal related activity.

67. Based on my training and experience, I know that each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers, as transmitted from a cellular device to a cellular antenna or tower, can be recorded by pen register and trap and trace devices and indicate the identity of the cellular device making the communication without revealing the communication's content.

68. Based on my training and experience, I know that wireless providers such as Provider typically collect and retain information about their subscribers in

their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as Provider typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify **Subject Phone 2** and **Subject Phone 3** user or users and may assist in the identification of co-conspirators and/or victims.

## AUTHORIZATION REQUEST

69. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c). The proposed warrant will also function as a pen register order under 18 U.S.C. § 3123, authorizing the installation and use of pen register and trap and trace devices to record, decode, and/or capture the dialing, routing, addressing, and signaling information described above for each communication to or from **Subject Phone 1** and **Subject Phone 2**, to include the date, time, and duration of the communication, without geographic limit, for a period of 30 days pursuant to 18 U.S.C. § 3123(c)(1).

25

70.     I further request that the Court direct Provider to disclose to the government any information described in Attachment B that is within the possession, custody, or control of Provider. I also request that the Court direct Provider to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with Provider's services, including the installation and operation of pen register and trap and trace devices and by initiating a signal to determine the location of **Subject Phone 2** and **Subject Phone 3** on Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate Provider for reasonable expenses incurred in furnishing such facilities or assistance.

71.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice in excess of 30 days from the end of the period of authorized surveillance, specifically, for 90 days from the date of the warrant, until June 28, 2022. This delay is justified because there is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice may seriously jeopardize the ongoing investigation by prematurely revealing its existence and giving DEL TORO or other DEL TORO DTO associates an opportunity to flee from prosecution, destroy or tamper with evidence, intimidate potential witnesses, notify confederates, and

change patterns of behavior, and endanger the life or physical safety of an individual, such as undercover officers utilized to interact and purchase narcotics from the DEL TORO DTO. *See* 18 U.S.C. § 3103a(b)(1). Moreover, for the reasons set forth above, including the fact that undercover officers are working to arrange a future narcotics transaction with DEL TORO and associates of the DEL TORO DTO, the facts of this case justify a period of delay in excess of 30 days. Furthermore, there is reasonable necessity for the use of the technique described above, for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

72.     I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate **Subject Phone 2** and **Subject Phone 3** outside of daytime hours. In addition, because the warrant will be served on Provider, who will then compile the requested records at a time convenient to it, good cause exists under Rule 41 to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

*Mohammad A. Yusuf w/p PAN*
_____
Mohammad A. Yusuf
Task Force Officer
Drug Enforcement Administration

Sworn to and affirmed by telephone on May 6, 2022

_____
HON. JEFFREY COLE
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Property to Be Searched

1.      The cellular telephone assigned call number (773) 574-9769, currently using IMEI 351224675406550, subscribed to Jose DEL TORO, at 8730 N. Springfield Avenue, Skokie, Illinois, and used by Freddy DEL TORO ("**Subject Phone 3**"), with service provided by T-MOBILE ("Provider"), a company headquartered at 4 Sylvan Way, Parsippany, New Jersey, 07054; and the cellular telephone assigned call number (312) 483-9994 currently using IMEI 355070814282730, subscribed to "Prepaid Customer," at 4001 W Armitage Ave Chicago, Illinois, and used by members of the DEL TORO DTO including Freddy DEL TORO, ("**Subject Phone 2**"), with service provided by T-MOBILE ("Provider").

2.      This warrant applies to records and information associated with **Subject Phone 2** and **Subject Phone 3** that are within the possession, custody, or control of Provider**,** including information about the location of the cellular telephone if it is subsequently assigned a different call number.

## ATTACHMENT B

### Particular Things to be Seized

I.      **Information to be Disclosed by the Provider**

    A.      **Prospective Location Information to be Disclosed**

All information about the location of **Subject Phone 2** and **Subject Phone 3** described in Attachment A for a period of 30 days, during all times of day and night. "Information about the location of **Subject Phone 2** and **Subject Phone 3**" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from **Subject Phone 2** and **Subject Phone 3**.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of T-MOBILE ("Provider"), Provider is required to disclose the Location Information to the government. In addition, Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with Provider's services, including by initiating a signal to determine the location of **Subject Phone 2** and **Subject Phone 3** on Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate Provider for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U. S. C.§ 3103a(b)(2).

**B.     Additional Information to be Disclosed**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to **Subject Phone 2** and **Subject Phone 3**:

1.     The following information about the customers or subscribers associated with **Subject Phone 2** and **Subject Phone 3** for the time period from March 2, 2022, to present:

    i.   Names (including subscriber names, user names, and screen names);

    ii.  Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

    iii. Local and long-distance telephone connection records;

    iv.  Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

v. Length of service (including start date) and types of service utilized;

vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address);

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by **Subject Phone 2** and **Subject Phone 3**, including: (1) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and (2) information regarding the cell tower and antenna face

32

(also known as "sectors") through which the communications were sent and received: as well as per-call measurement data (also known as "real-time tool" or "RTT").

x. Information associated with each communication to and from **Subject Phone 2** and **Subject Phone 3** for a period of 30 days from the date of this warrant, including:

xi. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

xii. Source and destination telephone numbers;

xiii. Date, time, and duration of communication; and

xiv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which **Subject Phone 2** and **Subject Phone 3** will connect at the beginning and end of each communication.

Provider is required to furnish to the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described above in Sections I.B.1 and I.B.2, unobtrusively and with a minimum of interference with Provider's services, including through the installation and operation of pen register and trap and trace devices. The government shall reasonably compensate Provider for reasonable expenses incurred in furnishing such facilities or assistance.

## II.    Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of Title 21, United States Code, Sections 841(a)(1) and 843 involving Alexis DEL TORO and associates of the DEL TORO DTO during the period from March 2, 2022, to the present.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.